

AO 91 (Rev. 11/11) Criminal Complaint

AUSA John D. Mitchell (312) 353-5159
AUSA Grayson S. Walker (312) 697-4091

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG − 9 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

DESHAWN MORGAN,
    a.k.a. "Tiny," a.k.a. "Big Bro";
DARIUS MURPHY,
    a.k.a. "Scudder" ; and
DEMOND BROWN,
    a.k.a. "Looney"

CASE NUMBER:
**UNDER SEAL**

**19 CR 641**

**MAGISTRATE JUDGE VALDEZ**

### CRIMINAL COMPLAINT

    I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or about December 2017 to in or about February 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants violated:

| Code Section | Offense Description |
|---|---|
| Title 18 United States Code, Section 1958 | conspiracy to use, and cause another to use, an interstate facility, that is, a cellular telephone, with intent that a murder be committed, that is, the murder of Donald Holmes, Jr. and Diane Taylor, as consideration for a promise and agreement to pay something of pecuniary value, that is, United States currency |

    This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

PAUL R. DAOU
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Sworn to before me and signed in my presence.

Date: August 9, 2019

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

*Judge's signature*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, PAUL R. DAOU, being duly sworn, state as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed since approximately September 2015.

2.      As part of my duties as an ATF Special Agent, I investigate firearms offenses, including violations of Title 18, United States Code, Sections 922 and 924; narcotics offenses, including violations of Title 21, United States Code, Sections 841(a)(1) and 846; and violent crimes, including violations of Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering) and Title 18, United States Code, Section 1958 (Murder for Hire). I have received training in the area of gang investigations, firearms investigations, narcotics investigations, money laundering, and financial investigations.

3.      This affidavit is submitted in support of a complaint charging DESHAWN MORGAN (a.k.a. "Tiny," a.k.a. "Big Bro"), DARIUS MURPHY (a.k.a. "Skudder"), and DEMOND BROWN (a.k.a. "Looney") with conspiracy to commit murder for hire, in violation of Title 18 United States Code, Section 1958. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MORGAN, MURPHY, and BROWN with conspiracy to commit murder for hire, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are

1

necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

4.      This affidavit is based on my personal knowledge based on my participation in the investigation, the results of physical surveillance, information provided to me by other law enforcement agents, court-authorized intercepted phone calls, consensually recorded conversations, recorded jail phone calls, witness interviews, including interviews with confidential informants and cooperating defendants, records from various law enforcement databases, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted.

## I.      FACTS SUPPORTING PROBABLE CAUSE

5.      In summary, law enforcement officers from ATF, the Chicago Police Department ("CPD"), the Drug Enforcement Administration, and the Internal Revenue Service have obtained evidence showing that, between in or about December 2017 and February 2018, DESHAWN MORGAN hired DARIUS MURPHY and DEMOND BROWN to murder Donald Holmes, Jr. (a.k.a. "Don Don") and Diane Taylor in exchange for approximately $5,000 and an assault rifle.  MORGAN, MURPHY, and BROWN used their cellular phones to coordinate this murder-for-hire conspiracy and to lure Holmes, Jr. to the scene of the murder.  As discussed below:

a.      On January 31, 2018, at approximately 11:13 p.m., Donald Holmes, Jr. and Diane Taylor were murdered inside Holmes, Jr.'s 2017 Jeep Cherokee while parked on the 4700 block of Arthington Street on the west-side of

Chicago. Both victims were shot multiple times in the back of the head by a Smith and Wesson 9 mm semiautomatic pistol.

      b.     In September and October 2018, a cooperating defendant, acting at law enforcement's direction, wore a concealed recording device and participated in recorded conversations inside Cook County Jail with MURPHY and BROWN. During those recorded conversations, MURPHY and BROWN explained that MORGAN hired them to murder Holmes, Jr., because MORGAN believed Holmes, Jr. was working as a confidential informant and providing information to law enforcement about, among other things, MORGAN's heroin trafficking. During the recordings, MURPHY admitted that he was the one who shot and killed both Holmes, Jr. and Taylor, and he explained that he did so by shooting each of them in the head several times. MURPHY and BROWN stated that, after carrying out the double murder, MORGAN paid them at least $5,000 and an assault rifle.

      c.     Though he was not working with law enforcement at the time of his murder, Holmes, Jr. had in fact been a cooperating source with the FBI.

      d.     On November 30, 2017, MORGAN made arrangements over a lawfully intercepted call to pick up one or more firearms from Holmes, Jr.'s residence. Following this call, surveillance observed MORGAN leaving Holmes, Jr.'s residence and stopped him and searched his car after he departed the area. Following this incident, MORGAN began telling multiple people that he suspected Holmes, Jr. of cooperating with law enforcement and that he wanted Holmes, Jr. killed.

e.     Court-authorized historical cell site data for MURPHY and BROWN's respective phones show that both phones were in the area of the murders at the time Holmes, Jr. and Taylor were killed.  In addition, probation records show that MURPHY lived less than 50 feet from the scene of the murders, and BROWN's phone was found to have a video, apparently taken from an upper floor of MURPHY's residence, of police processing the scene of the murders soon after Holmes, Jr. and Taylor were killed.

f.     Phone records and surveillance video from a near-by gas station show that MORGAN, MURPHY, and BROWN were in touch with Holmes, Jr. immediately before Holmes, Jr. was killed. These phone contacts are consistent with the recorded conversations that CD-1 had with BROWN and MURPHY inside Cook County Jail, during which they stated that, at MORGAN's direction, they lured Holmes, Jr. to the scene of his murder under false pretenses.

g.     During consensually recorded meetings with CD-1, BROWN and MURPHY stated that they purchased a car with a portion of the money they received from MORGAN for killing Holmes, Jr and Taylor. Information seized from BROWN's phone and obtained from Witness 2 show that BROWN did in fact purchase a car the day after the murders.

h.     On or about February 5, 2018—approximately five days after Holmes, Jr. and Taylor were murdered—MORGAN, MURPHY, and BROWN met each other at the scene of the murders, at which location MORGAN handed an unidentified object (possibly money) to MURPHY.

i. Consensually recorded calls between BROWN and MURPHY, phone location information, and seized text messages from BROWN's phone show that, in the days following the murders, BROWN traveled to Minnesota and traded the firearm that MURPHY used to kill Holmes, Jr. and Taylor to Individual C. Individual C in turn transferred that firearm—a Smith and Wesson 9 mm semiautomatic pistol—to Individual D, whom law enforcement later found in possession of the weapon. Ballistic testing subsequently showed that the firearm recovered from Individual D was the same firearm used to murder Holmes, Jr. and Taylor on January 31, 2018.

**A.    The Murder of Holmes, Jr. and Taylor**

6.    On January 31, 2018, at approximately 11:13 p.m., Holmes, Jr. and his girlfriend, Taylor, were murdered on the 4700 block of Arthington Street on the west-side of Chicago. The murder occurred inside Holmes, Jr.'s 2017 Jeep Cherokee. According to police reports and photographs of the scene:

a.    Holmes, Jr. was seated in the front passenger's seat of the Jeep Cherokee and died from four gunshot wounds to the back of his head. Taylor was seated in the driver's seat of the Jeep Cherokee and died from two gunshot wounds to the back of her head.

b.    Law enforcement officers arrived at the scene shortly after the murders. Inside the Jeep Cherokee, officers recovered six shell casings, and outside the Jeep Cherokee officers recovered one additional shell casing. Based on ballistics testing, law enforcement officers determined that all seven shell casings were fired

from a Smith and Wesson 9 mm semiautomatic pistol.

**B.     A Cooperating Defendant Implicates MORGAN, MURPHY, and BROWN in the Holmes, Jr. and Taylor Murders**

7.     In or about August 2018, law enforcement officers interviewed a cooperating defendant ("CD-1"),[1] who stated that he had information relating to the murder of Holmes, Jr. and Taylor. During interviews with law enforcement, CD-1 explained that:

a.     Based on information from BROWN and other sources, CD-1 believed that MORGAN may have hired MURPHY and BROWN to murder Holmes, Jr.

b.     CD-1 is a senior member of the Wicked Town faction of the Traveling Vice Lords street gang ("Wicked Town TVLs") and also a long-time friend of Holmes, Jr.  BROWN and MURPHY are younger, more junior members of the Wicked Town TVLs.  Based on CD-1's standing in the gang and relationship with Holmes, Jr., BROWN and MURPHY would recognize that they owed CD-1 an explanation as to why they had murdered CD-1's friend, Holmes, Jr., and his friend's girlfriend, Taylor.  Accordingly, if BROWN and MURPHY had in fact conspired with MORGAN to murder Holmes, Jr. and Taylor, BROWN and MURPHY would speak with CD-1 about their roles in the murders.

---

[1] CD-1 has criminal convictions for narcotics trafficking, firearms offenses, and violent felonies. CD-1 is cooperating in the hope of obtaining a reduced sentence for pending federal narcotics and firearms charges. No promises have been made to CD-1 about what consideration CD-1 may receive for her/his cooperation. The information provided by CD-1 has proven to be reliable and has been corroborated by, among other things, consensually recorded meetings.

8.     Agents obtained a copy of a letter from the Illinois Department of Corrections that CD-1 claimed he had received from BROWN while they were both in custody at Stateville Correctional Center in Joliet, Illinois.  In the letter, BROWN suggested, in coded language, that he had a role in murdering Holmes, Jr.  For example, BROWN wrote, "I let Blood [MORGAN] trick me on dude [MORGAN tricked BROWN into participating in the Holmes, Jr.'s murder]." BROWN also wrote, "I need to work my way your way so that I can rap with you one-on-one…It's a lot of shit that's been going on that I'm not trying to put in this kite [a 'kite' is an unauthorized letter passed between prisoners] but we will talk soon."[2]

### C.     Recordings at Cook County Jail in September and October 2018

9.     In September and October 2018, CD-1, acting at law enforcement's direction, wore a recording device inside Cook County Jail and participated in recorded conversations with BROWN and MURPHY. As discussed below, during these recorded conversations, BROWN and MURPHY discussed, in detail, how MORGAN paid them to murder Holmes, Jr. and his girlfriend, Taylor.

---

[2] Some of the documents and lawfully-recorded conversations obtained in this case ("recorded conversations") have been summarized in this Affidavit. The language that is quoted from the recorded conversations throughout this Affidavit is based upon a preliminary review of the recorded conversations, and not final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate and in central time, unless otherwise noted. The summaries do not include all statements or topics covered during the course of the recorded conversations. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from CD-1, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

1. **BROWN Tells CD-1 that MORGAN Hired BROWN and MURPHY to Murder Holmes, Jr.**

10.     On September 25, 2018, CD-1, acting at agents' direction, met with BROWN[3] inside Cook County Jail.  Prior to this meeting, agents outfitted CD-1 with concealed audio recording equipment and used surveillance cameras inside Cook County Jail to observe CD-1 meet with BROWN.  During this meeting, BROWN and CD-1 had multiple conversations throughout the day about the murder:

a.     BROWN told CD-1 that MORGAN had tricked BROWN and MURPHY into committing the murder by telling BROWN and MURPHY that Holmes, Jr. was working as a confidential informant and was providing information to law enforcement about both CD-1 and MORGAN (a.k.a. "Tiny").[4]  BROWN stated that MORGAN convinced BROWN and MURPHY to murder Holmes, Jr. by saying to BROWN and MURPHY, "'He [Holmes, Jr.] sent the police to [CD-1's] crib. He got me [MORGAN] locked up [MORGAN said that Holmes, Jr. had given information to law enforcement about both MORGAN and CD-1].'"

---

[3] Agents identified BROWN and BROWN's voice as follows: Agents used video surveillance cameras inside Cook County Jail to monitor the meetings between BROWN and CD-1, and agents familiar with BROWN's voice based on in-person interviews and BROWN's recorded Cook County Jail calls positively identified BROWN as the person who participated in the recorded conversations with CD-1.

[4] During the investigation, agents have interviewed numerous witnesses, including CD-1, CS-1, and Witness 1, who have identified a photograph of DESHAWN MORGAN as the person they know by the nickname "Tiny." Further, during court-authorized intercepted calls over MORGAN's phone, MORGAN and numerous people with whom he spoke regularly referred to MORGAN by the nickname "Tiny."

b. BROWN also explained how he, MORGAN and MURPHY lured Holmes, Jr. to the 4700 block of West Arthington Street on January 31, 2018 for the purpose of murdering him. BROWN stated that MORGAN owed Holmes, Jr. a gun and some cash, and MORGAN, BROWN and MURPHY agreed that they would tell Holmes, Jr. to retrieve the gun and money from MURPHY on the 4700 block of West Arthington Street, where MURPHY lived. Specifically, BROWN said, "Tiny [MORGAN] owed Don Don [Holmes, Jr.] a pipe [a firearm]…Tiny [MORGAN] was like, 'Look, this how you do it, man. Tell him [Holmes, Jr.] that you [BROWN] got that for him, the pipe [the firearm].' Know what I'm saying? That's how I got him over there. 'I got this pipe [firearm] and a couple of dollars for you.' You feel me?"

c. CD-1 said, "Yeah, you should of stood down when you see her though [BROWN and MURPHY should have called off the murder when they saw Taylor in the vehicle with Holmes, Jr.]. Dude [MORGAN] knew what he was doing because he knew she always gonna be with him when he taking care of business [MORGAN knew that Taylor would be in the car with Holmes, Jr. on January 31, 2018]." BROWN agreed, saying, "Tiny [MORGAN] a grease ball, man."

d. BROWN stated that MORGAN had paid BROWN and MURPHY for the murder. CD-1 asked, "But did he pay you though [did MORGAN pay you for the murder]?" BROWN answered, "He still owe me, fuck, 10 [$10,000]." CD-1 asked, "He didn't give you the 10 [$10,000]?" BROWN answered, "Yeah, he gave me that. But he still owe me. [MORGAN still owed some of the money for the murder]."

e.    BROWN suggested that MORGAN would have to pay more money because he and MURPHY also had to murder Taylor. BROWN said, "Give a mother fucker five now and five later [$5,000 immediately after the murder and $5,000 later]....It was never supposed to have went how it went. You see what I'm saying? Man, motherfucker got to pay me something else, too [MORGAN owed more money because BROWN and MURPHY had agreed to murder Holmes, Jr., not Taylor]."

f.    CD-1 and BROWN also discussed the firearm MURPHY used to murder Holmes, Jr. and Taylor.  CD-1 said, "I hope you were smart enough to...[get rid of the murder weapon]."  BROWN said, "I got rid of that motherfucker [the murder weapon] the next morning."

g.    BROWN discussed a search warrant that law enforcement executed on February 7, 2018 at MURPHY's house on the 4700 block of West Arthington Street.[5] BROWN said, "The crib right there [MURPHY's house is on Arthington, near the murder]. They [law enforcement] hit the crib. I had moved everything out of there already."

**2.    MURPHY Tells CD-1 that MORGAN Paid Him Money to Murder Holmes, Jr., and that MURPHY Shot Holmes, Jr. and Taylor Multiple Times in the Back of the Head.**

11.    On September 28, 2018, CD-1, acting at agents' direction, met with

---

[5] Law enforcement did in fact execute a search warrant at MURPHY's residence on or about February 7, 2018.

MURPHY[6] inside Cook County Jail. Prior to these meetings, agents outfitted CD-1 with concealed audio recording equipment and used surveillance cameras inside Cook County Jail to observe CD-1 meet with MURPHY. During the meetings, MURPHY and CD-1 had multiple conversations throughout the day about the murder:

a. MURPHY explained how he murdered Holmes, Jr. and Taylor. MURPHY said, "Don Don [Holmes, Jr.] dead now." CD-1 replied, "Yeah, I know. I know. I was a little bit salty because, you know, that's like a brother. You feel me? [CD-1 was not happy that MURPHY and BROWN had murdered Holmes, Jr. because CD-1 viewed Holmes, Jr. as a brother]."

b. MURPHY said, "Look, his name came up in the paperwork. I'm talking about paperwork [MURPHY said that Holmes, Jr. was acting as a law enforcement informant and his name appeared on a search warrant or documents produced during discovery in a criminal case]."

c. MURPHY said, "After that I know who Don Don is, you feel me? I gotta do him. You feel me [MURPHY found out that Holmes, Jr. was providing information to law enforcement]? After that, Tiny [MORGAN] come get down on me, man. [MORGAN said,] 'Don Don [Holmes, Jr.], this the same motherfucker.' Ok, what you got for me [MURPHY asked what MORGAN would pay MURPHY to murder Holmes, Jr.]? He said, 'I got a couple of bucks for you, bam."

---

[6] Agents identified MURPHY and MURPHY's voice as follows: Agents used video surveillance cameras inside Cook County Jail to monitor the meetings between MURPHY and CD-1, and agents familiar with MURPHY's voice based on in-person interviews and MURPHY's recorded Cook County Jail calls positively identified MURPHY as the person who participated in the recorded conversations with CD-1.

d. MURPHY explained that he agreed to commit the murder, saying, "We get up with Don Don. 'Put me in the car with him [MURPHY told MORGAN to give him (MURPHY) the opportunity to get in a car with Holmes, Jr. so he could commit the murder].'"

e. MURPHY explained how he murdered Holmes, Jr. and Taylor inside Holmes, Jr.'s vehicle. Specifically, MURPHY said, "I call the n------. 'I'm at the house [MURPHY told Holmes, Jr. to come to MURPHY's house on the 4700 block of West Arthington]. He [Holmes, Jr.] pull up.' His bitch [Taylor] driving. He [Holmes, Jr.] in the passenger seat. He [Holmes, Jr.] try to hand me something through the window [Holmes, Jr. tried to get the gun and money from MURPHY through the passenger's side window]. I say, 'naw, man.' I get in the back seat. Shoot that bitch in the back of his shit. Pow Pow! [MURPHY entered the back seat of the Jeep Cherokee and shot Holmes, Jr. twice in the back of the head]."

f. MURPHY continued, "His bitch tried to bail out. I grabbed her by the back of her wig. I said, 'Where you going?' Pow Pow! I hit her in her shit two times [Taylor tried to flee, but MURPHY grabbed her by her hair and shot her twice in the back of the head]. Then I turn, hit him in his shit two more times. Pow Pow! [MURPHY shot Holmes, Jr. two more times in the head]. Take the work. I'm out this bitch [MURPHY took Holmes, Jr.'s money and/or drugs and fled]."

12. On October 15, 2018, CD-1 again participated in recorded conversations with MURPHY inside Cook County Jail. Prior to these meetings, agents outfitted CD-1 with concealed audio recording equipment and used surveillance cameras

inside Cook County Jail to observe CD-1 meet with MURPHY. During the meetings, MURPHY and CD-1 had additional conversations throughout the day about the murder:

      a.     MURPHY said, "I didn't know Don Don [Holmes, Jr.] from a can of paint. So it ain't my fault I killed him." CD-1 said, "I aint' gonna worry about it." MURPHY responded, "Listen! It like if you call me and say, 'Kill this n-----. He snitching on me.' I don't know dude. I'm gonna take your word. You're one of the guys. I'm gonna kill him! That's what happened. Dude [MORGAN] called me. Alright, I'm fitting to do it [MURPHY killed Holmes, Jr. because MORGAN said Holmes, Jr. was giving information about MORGAN and CD-1 to law enforcement, and MURPHY would do the same thing if CD-1 needed MURPHY to kill someone]."

      b.     MURPHY added, "Tiny [MORGAN] called. Alright? I don't know the n-----. You feel me? You would kill a n---- you don't know for one of the guys, right [MURPHY did not know Holmes, Jr., but he killed him at MORGAN's direction]?"

      c.     MURPHY explained that MORGAN paid MURPHY and BROWN after the murder. Specifically, MURPHY said, "I do him. I do him dirty [MURPHY killed Holmes, Jr.]. Then the n-----, Tiny [MORGAN] bring me some money. He bring me $2,500 at first. I'm like, 'What's this for?' He like, 'For the work you did the other day.' He say, 'I'm waiting on the other half.' Like two days go by and he brings me the other $2,500."

      d.     MURPHY added that MORGAN also gave MURPHY an assault rifle. "They bring me a 'chopper.' An AR [Assault Rifle]. You know the one Demond

13

[BROWN] got locked up with? That was mine...It was an AR pistol. That bitch like this big. It take 5-5-7 bullets. [MORGAN's payment for the murder included an assault rifle pistol, which Chicago Police Officers seized from BROWN on or about March 13, 2018]." A photograph of the assault rifle pistol that law enforcement seized from BROWN on March 13, 2018 is pictured below:



e.     MURPHY stated that he and BROWN purchased a used car with some of the money that MORGAN paid them for the double murder.  Specifically, during the recordings, CD-1 asked, "Did he [MORGAN] pay you the whole thing?" MURPHY answered, "Tiny came out the blue and gave me five bucks [$5000]. I'm like, I buy a car. Before I buy a car, we go shopping."

f.     Later, MURPHY said, "Man, the next day [February 1, 2018, the day after the murder], we go buy a car. You feel me? Demond [BROWN] get the car took trying to be with this bitch."

### D. Other Evidence Corroborates the Cook County Recordings

13. During the investigation, law enforcement officers have gathered substantial evidence confirming that MORGAN in fact paid MURPHY and BROWN to murder Holmes, Jr. and Taylor. Some of the corroborating evidence is summarized below.

#### 1. Holmes, Jr. Previously Worked as a Paid FBI Cooperating Source

14. As noted above, during the recordings at Cook County Jail, MURPHY and BROWN stated that MORGAN hired them to murder Holmes, Jr. because MORGAN believed Holmes, Jr. was working as a government informant. During the investigation, law enforcement officers have learned that, beginning in or about 2010, Holmes, Jr. in fact worked as a confidential human source for the FBI. Holmes, Jr. received compensation from the FBI for his work as a confidential source.

15. For example, in 2011, Holmes, Jr., at the FBI's direction, wore recording devices during a controlled purchase of more than 100 grams of heroin from Individual A, a member of the Black P Stones street gang. Based on Holmes, Jr.'s controlled purchase of heroin, in August 2016 a judge in the United States District Court for the Northern District of Illinois sentenced Individual A to 60 months' imprisonment.[7]

---

[7] In 2013, Holmes, Jr. was sentenced to 6 years' imprisonment in the Illinois Department of Corrections based on a conviction for manufacture/delivery of a controlled substance (heroin), and he had not worked as an FBI paid confidential source since that time.

    **2.**     **MORGAN Begins to Suspect Holmes, Jr. is Working with Law Enforcement, and Arranging to Have Him Killed, After Police Stop and Search MORGAN for a Firearm that he had Obtained from Holmes, Jr.**

16.   In 2017 and 2018, law enforcement officers were engaged in an investigation of violence and narcotics trafficking on the west side of Chicago, and as part of that investigation identified MORGAN, Holmes, Jr., and others who were working together to distribute heroin in and around Chicago. On or about November 8, 2017, Presiding Judge Leroy K. Martin, Jr. of the Circuit Court of County, Illinois, entered an order authorizing the interception of wire communications to and from a phone used by Holmes, Jr. ("Holmes, Jr. Phone 1").

17.   On November 30, 2017 (Session 96727)—approximately two months before Holmes, Jr. was murdered—Holmes, Jr., who was using Holmes, Jr. Phone 1,[8] had a three-way call involving MORGAN, using MORGAN Phone 1,[9] and one of their narcotics trafficking associates, Individual B. During the call, MORGAN asked, "Where you put the lick [firearm]?" Individual B answered, "I got it with me. It right

---

[8] Agents identified Holmes, Jr. as the user of Holmes, Jr. Phone 1 as follows: In May 2017, law enforcement officers conducted surveillance and identified Holmes, Jr. based on a positive comparison to one of Holmes, Jr.'s CPD booking photos. On June 6, 2017, LEOs used a pole camera to conduct surveillance and observed Holmes, Jr. sitting on the front porch of his residence on the 4700 block of W. Maypole Avenue with a cellular phone in his hand. During this surveillance, officers placed a covert phone call to Holmes, Jr. Phone 1 at 5:27 p.m. and observed Holmes, Jr. answer the phone. At 5:28 p.m., officers placed a second covert call to Holmes, Jr. Phone 1 and again observed Holmes, Jr. answer the phone. Further, Holmes, Jr. Phone 1 was found on Holmes, Jr.'s person at the time of his death on January 31, 2018.

[9] Law enforcement officers identified DESHAWN MORGAN as the user of MORGAN Phone 1 based in part on the following. Law enforcement officers familiar with MORGAN's voice based on, among other things, in-person interviews with MORGAN and recorded Cook County Jail calls placed by MORGAN positively identified MORGAN in this call.

here at shorty's crib. I'll grab it and bring it to Maypole right now [Individual B agreed to bring the firearm to Holmes, Jr.'s residence, which was located on the 4700 block of West Maypole Avenue in Chicago]." MORGAN said, "Yeah, grab it [the firearm]. I'll meet you right now."

18.     Following this intercepted call, surveillance observed MORGAN exit Holmes, Jr.'s residence on the 4700 block of W. Maypole, enter a silver Hyundai Santa Fe, and drive away from the area. Based on the aforementioned intercepted call, law enforcement officers believed that MORGAN might have retrieved a firearm from Holmes, Jr.'s residence and initiated a stop of MORGAN's car on the 4000 block of West Chicago Avenue. During the stop:

     a.     Several officers, including several plain-clothed officers driving covert unmarked police vehicles, were involved in this stop. Based on the aforementioned call that suggested MORGAN was armed, several of the officers approached the vehicle with their service weapons drawn.

     b.     MORGAN provided the officers with a Wisconsin driver's license bearing his name and photograph. Law enforcement officers conducted a search of MORGAN's vehicle but did not recover any firearms, and released him without charges.

19.     Later that day, at approximately 3:45 p.m. (Session 96900), MORGAN, using MORGAN Phone 1, had a phone call with Holmes, Jr., who was using HOLMES, JR. Phone 1. During the call:

     a.     MORGAN said, "Man, someone put 12 [law enforcement] on me,

bro." Holmes, Jr. asked, "What happened?" MORGAN responded, "Billion cars. Billion cars. On my kids [reference to traffic stop from earlier that day involving numerous officers]." Holmes, Jr. responded, "Get the fuck out of here."

      b.    MORGAN added, "Four or five unmarked [unmarked police cars] trail us. But I sweep em." Holmes, Jr. asked, "After you picked the move [the gun] up or after?" MORGAN answered, "After I picked the move up. On my kids. We three, three deep. Three moves [MORGAN had picked up three guns]…police everywhere." Holmes, Jr. asked, "They didn't do shit though [officers did not find the guns]?" MORGAN answered, "Boxed us in. Tried to box us in. Like 50 cars [describing the traffic stop]."

    20.    Based on my training, experience, and familiarity with this case—including the aforementioned intercepted calls, CD-1's consensually recorded meetings with BROWN and MURPHY, and information obtained from Witness 1 and CS-1 (discussed below)—I believe that, by the time law enforcement stopped MORGAN and searched his vehicle on November 30, 2017, MORGAN (a) began to believe that Holmes, Jr. was cooperating with law enforcement; and (b) started developing a motive to have Holmes, Jr. killed.

    21.    According to an individual who lived with MORGAN in December 2017 and January 2018 ("Witness 1"), approximately one month after MORGAN was stopped and searched by police, and approximately one month before Holmes, Jr. and Taylor were murdered, Witness 1 heard MORGAN talking about his suspicions that Holmes, Jr. was cooperating with law enforcement. Specifically, according to Witness

1, in or about late December 2017 or early January 2018 MORGAN said something to the effect of, "That n----- Holmes, Jr. was probably wearing a wire."

22.     In mid-December 2017—approximately one month after MORGAN was stopped and searched by police, and approximately a month before Holmes, Jr. and Taylor were murdered—a confidential informant ("CS-1")[10] advised law enforcement that he had recently met with MORGAN, at MORGAN's request, at a Leamington Foods in Bellwood, Illinois. According to CS-1, during this unrecorded meeting:

    a.     MORGAN told CS-1 that he believed that Holmes, Jr. was working with the "Feds" and providing federal law enforcement officers with information about unlawful activity of both MORGAN and CS-1.

    b.     MORGAN said that his suspicions about Holmes, Jr. were based on a recent traffic stop by law enforcement officers. MORGAN recalled that he was on his way to pick up a gun, which MORGAN referred to as a "pipe," and he was stopped by police shortly after picking up the gun.

    c.     MORGAN further told CS-1 that the officers who participated in the traffic stop had "guns drawn" and they jumped out of "regular looking cars," rather than exclusively marked squad cars. MORGAN told CS-1 that Holmes, Jr.

---

[10] CS-1 began cooperating with law enforcement in November 2017 in the hope of receiving favorable treatment with respect to imminent federal firearms charges. During the course of CS-1's cooperation, she/he received approximately $5,000 in monetary compensation from law enforcement. CS-1 provided credible information that was corroborated through consensually recorded phone calls, controlled purchases/meetings, and other sources. CS-1 was ultimately charged with a firearms offense and not given cooperation credit, due to an unauthorized narcotics for firearms transaction that occurred in December 2017. CS-1 has several arrests and convictions for narcotics-related offenses and other offenses.

was the only person who knew that MORGAN had picked up the gun, and MORGAN told CS-1 that Holmes, Jr. must have been the person who disclosed the information to the law enforcement officers who initiated the traffic stop.

        d.     MORGAN said that Holmes, Jr. was going to bring MORGAN and CS-1 "down" if he wasn't killed.

        e.     MORGAN and CS-1 agreed that CS-1 would murder Holmes, Jr., and CS-1 stated that he would shoot Holmes, Jr. from far away using a rifle. MORGAN told CS-1 that it would not be necessary for CS-1 to shoot Holmes, Jr. from far away. Instead, MORGAN told CS-1 that CS-1 should arrange to meet with Holmes, Jr. to purchase heroin. MORGAN stated that CS-1 should arrive for the heroin purchase and then "blow [Holmes, Jr.'s] brains out and drive away," and nobody would suspect CS-1 because CS-1 did not live in the neighborhood.

    23.    Based on my training, experience, and familiarity with this case—including the aforementioned intercepted calls, CD-1's consensually recorded meetings with BROWN and MURPHY, information obtained from Witness 1 and CS-1, and information obtained from the scene of the murders—I believe that:

        a.     CS-1's account of MORGAN's reason for wanting Holmes, Jr. killed, namely, Holmes, Jr.'s suspected involvement in a police stop of MORGAN following MORGAN's collection of a firearm, matched the sequence of events on November 30, 2017, when police stopped MORGAN following intercepted calls in which he arranged to pick up a firearm from Holmes, Jr.'s residence;

        b.     CS-1's account of MORGAN's suggestions for killing Holmes, Jr.,

including luring Holmes, Jr. to the scene of the murder with a ruse call and killing Holmes, Jr. at close range by shooting him in the back of the head, mirror (i) the suggestions that BROWN and MURPHY said they received from MORGAN prior to their murder of Holmes, Jr. and Taylor and (ii) the manner in which Holmes, Jr. and Taylor were ultimately killed; and

      c.     MORGAN did in fact ask CS-1 to kill Holmes, Jr. in December 2017, only weeks before Holmes, Jr. and Taylor were killed.

### 3. MURPHY and BROWN Were near the Murder Scene on the Night of the Murder

24.     In December 2017, MURPHY was released from the Illinois Department of Corrections Youth Facility and placed on juvenile parole by the Illinois Department of Juvenile Justice. According to parole records and information from MURPHY's parole officer, on January 31, 2018—the day Holmes, Jr. and Taylor were murdered—MURPHY resided at 4738 West Arthington Street in Chicago, Illinois. According to police reports and other evidence, the Jeep Cherokee in which Holmes, Jr. and Taylor were murdered was parked less than 50 feet from MURPHY's residence, at 4734 West Arthington Street.

25.     According to court-authorized historical cell site data for HOLMES, JR. Phone, MURPHY's phone ("MURPHY Phone 1"),[11] and BROWN's phone ("BROWN

---

[11] MURPHY was identified as the user of MURPHY Phone 1 based in part on the following. In January and February 2018, MURPHY was on juvenile parole based on a juvenile armed robbery conviction. As a requirement of his parole, MURPHY was required to provide an updated phone number at which he could be reached by his parole officer. As of January 31, 2018, the phone number on file for MURPHY was the phone number for MURPHY Phone 1. Further, according to MURPHY's parole officer, he/she has called MURPHY at MURPHY

Phone 1"),[12] MURPHY Phone 1 and BROWN Phone 1 were in the area of 4738 West Arthington Street at the time Holmes, Jr. and Taylor were murdered on January 31, 2018, at approximately 11:13 p.m.

26.     In addition, on March 14, 2018, BROWN was arrested and consented in writing to a search of BROWN Phone 1, which he had on his person at the time of his arrest. During a search of BROWN Phone 1, law enforcement officers found a video that was created on February 1, 2018, at approximately 12:13 a.m., shortly after Holmes, Jr. and Taylor were murdered. The video showed law enforcement officers processing the scene of the murders and examining Holmes, Jr.'s Jeep Cherokee. The video appears to have been created from an upper floor inside MURPHY's residence located at 4738 West Arthington Street, just steps away from the murder scene. Below is a screenshot from the video found on BROWN Phone 1:

---

Phone 1 on several occasions prior to January 31, 2018, including on or about January 30, 2018. In addition, MURPHY Phone 1 is subscribed in the name of an individual who law enforcement officers have identified as MURPHY's mother. Further, according to the Illinois juvenile parole department, on February 2, 2018, MURPHY's mother called the juvenile parole department and stated that MURPHY had lost MURPHY Phone 1 and she gave the juvenile parole department a new number at which MURPHY could be reached.

[12] BROWN was identified as the user of BROWN Phone 1 based in part on the following. On February 7, 2018, law enforcement officers arrested BROWN, who provided officers his name and date of birth and was identified based on a positive comparison to known law enforcement booking photographs of DEMOND BROWN. At the time of his arrest, law enforcement officers seized BROWN Phone 1 from BROWN's person. In addition, in January and February 2018, BROWN was on parole based on a possession of a controlled substance and escape/violation of electronic monitoring conviction. As a requirement of his parole, BROWN was required to provide an updated phone number at which he could be reached by his Illinois Department of Corrections parole officer. As of January 31, 2018, the phone number on file for BROWN was the phone number for BROWN Phone 1.



### 3. Phone Records from January 31, 2019 Confirm Contacts Among the Co-Conspirators and between MURPHY and Holmes, Jr.

27. According to phone records for Holmes, Jr. Phone 1, MURPHY Phone 1, BROWN Phone 1, and MORGAN Phone 1, there were numerous communications between and among those phones on January 31, 2018, the day Holmes, Jr. and Taylor were murdered. For example, phone records show that, on January 31, 2018:

      a.     At approximately 10:44 p.m., MORGAN Phone 1 received two calls from Holmes, Jr. Phone 1.

      b.     Two minutes later, at approximately 10:46 p.m., MORGAN Phone 1 and MURPHY Phone 1 participated in a call.

      c.     Between approximately 10:44 p.m. and 11:05 p.m., MURPHY Phone 1 and Holmes, Jr. Phone 1 exchanged approximately six voice calls and texts. Prior to this date, MURPHY Phone 1 and Holmes, Jr. Phone 1 had never been in contact with each other. The last phone call between MURPHY Phone 1 and Holmes,

Jr. Phone 1, which occurred at 11:05 p.m., was the final phone call that Holmes, Jr. participated in before he was murdered approximately 8 minutes later.

28.    Based on my training, experience, and familiarity with this case—including the aforementioned intercepted calls, CD-1's consensually recorded meetings with BROWN and MURPHY, information obtained from Witness 1 and CS-1, information obtained from the scene of the murders, and location information for BROWN Phone 1 and MURPHY Phone 1—I believe that, during the aforementioned calls documented by these phone records, (a) MORGAN lured Holmes, Jr. to the scene of the murders by falsely telling him that BROWN and MURPHY would contact him to make arrangements to deliver a firearm and cash that MORGAN owed Holmes, Jr.; (b) BROWN and MURPHY made arrangements to meet with Holmes, Jr. at or near 4734 West Arthington Street, purportedly to deliver a firearm and cash, at MORGAN's request; and (c) MORGAN, BROWN, and MURPHY lured Holmes, Jr. to that location with the intent to kill him there.

29.    Law enforcement officers obtained video surveillance footage from a BP Gas Station located at 749 S. Cicero, which is approximately one block north of 4734 West Arthington Street, where Holmes, Jr. and Taylor were murdered.  In this surveillance footage, which recorded both video and audio:

    a.    Holmes, Jr. is captured inside the gas station, at approximately 11:02 p.m., approximately 11 minutes before he was murdered.

    b.    Holmes, Jr. participated in two phone calls using a cell phone. During the first call, at approximately 11:02 p.m., Holmes, Jr. stated to the individual

on the other end of the line (believed to be MURPHY),[13] "Hey, where you exactly stay at, kid? Right off the alley, correct? I am going to call you right back. Let me tell him to come out."

30.    Between approximately 10:45 p.m. on January 31, 2018, and 12:40 a.m. on February 1, 2018—the period of time immediately before and after the murders— there were approximately six calls and texts between BROWN Phone 1 and MORGAN Phone 1. Notably, on February 1, 2018, at approximately 12:40 a.m.— approximately an hour and a half after the murders— BROWN Phone 1 sent a text message to MORGAN Phone 1. The text message was a screenshot of a breaking news article regarding the murder of Holmes, Jr. and Taylor. Below is a screenshot of the article that was recovered during the search of BROWN Phone 1:



---

[13] Agents identified MURPHY as the individual speaking with Holmes, Jr. at that time as follows:  According to phone records, the first call recorded by the gas station surveillance camera coincides with a 44 second call at approximately 11:01 p.m. between HOLMES, JR. Phone 1 and MURPHY Phone 1.

### 4. BROWN and MURPHY Purchased a Car the Day After the Holmes, Jr. and Taylor Murders.

31.     As noted above, during the recorded conversations in Cook County Jail, MURPHY told CD-1 that he and BROWN purchased a car using some of the money that MORGAN paid them for the murder. During the search of BROWN Phone 1, officers reviewed the internet browser history and determined that on February 1, 2018, at approximately 10:54 a.m., BROWN searched craigslist.org for vehicles for sale for $1,000. Officers also discovered text messages in which BROWN Phone 1 received photos of used cars, including the following:



32.     During the investigation, officers interviewed Witness 2, who stated that she/he buys used vehicles at auctions and sells them for a profit. According to Witness 2, on February 1, 2018, Witness 2 sold BROWN a tan 2003 Buick LeSabre Custom for $900 in cash.

33.     Based on my training, experience, and familiarity with this case— including CD-1's consensually recorded meetings with BROWN and MURPHY,

communications recovered from BROWN Phone 1, and information obtained from Witness 2—I believe that BROWN purchased the tan 2003 Buick LeSabre Custom with a portion of the money that MORGAN paid him for murdering Holmes, Jr.

     **5.    On February 5, 2018, MORGAN, MURPHY, and BROWN Met Near the Scene of the Murder.**

34.    On February 5, 2018, at approximately 2:55 p.m.—approximately five days after Holmes, Jr. and Taylor were murdered—surveillance observed the following:

    a.    MORGAN,[14] driving a black Volvo SUV, parked to the east of MURPHY's residence at 4738 West Arthington Street, near the location where MURPHY lived and where Holmes, Jr. and Taylor had been murdered.

    b.    After MORGAN arrived, MURPHY and BROWN exited MURPHY's residence at 4738 West Arthington Street and approached MORGAN's Volvo SUV. Surveillance then observed MORGAN hand MURPHY an unknown item.

    c.    Moments later, MURPHY ran with the item he had received from MORGAN and entered his residence at 4738 West Arthington. BROWN then walked away from MORGAN's Volvo SUV and entered MURPHY's residence. MORGAN drove away from the area.

35.    Based on training, experience, and knowledge of the investigation, I believe that MORGAN, BROWN and MURPHY met on February 5, 2018 for the purpose of discussing the murder-for-hire conspiracy, so that MORGAN could pay

---

[14] Law enforcement officers identified MORGAN on February 5, 2018 as the driver of the Volvo SUV based on a positive comparison to a CPD booking photo of DESHAWN MORGAN.

BROWN and MURPHY money owed MORGAN owed them for carrying out the murder on January 31, 2018, or both.

### 5. BROWN Traveled to Minnesota to Swap the Murder Weapon for another gun.

36.     As discussed above, on or about February 7, 2018, agents executed a search warrant at MURPHY's residence on the 4700 block of West Arthington Street, but did not recover the murder weapon during that search. Further, as discussed above, during recorded conversations in Cook County Jail on September 28, 2018, BROWN explained that before law enforcement searched the house, he had removed the murder weapon and other evidence. Specifically, BROWN said, "I had moved everything out already."

37.     Based on court-authorized historical cell site data for BROWN Phone 1, as well as photographs and other information on BROWN Phone 1, law enforcement officers determined that BROWN traveled from Chicago to Minneapolis, Minnesota on or about February 9, 2018 until at least February 18, 2018.

38.     On February 9, 2018, at approximately 10:40 a.m., BROWN, using BROWN Phone 1, participated in a call with MURPHY, who was in custody at Cook County Jail following an arrest for a firearms offense.[15]  During the call:

        a.     MURPHY said, "Where you at?" BROWN replied, "I'm down here, shorty. You know, I had to take a trip [BROWN traveled to Minnesota to swap the

---

[15] The call was recorded based on Cook County Jail's standard recording policy. The jail's recording policy is announced at the beginning of every call and periodically throughout each call.

murder weapon for another firearm]." MURPHY said, "Oh yeah. Yeah. Yeah. Yeah. That was smart as fuck!"

      b.    MURPHY added, "I love you for that, shorty!" BROWN said, "You already know, bro...I'm like, I can kill two birds with one stone. Go down here [BROWN traveled to Minnesota both to visit family and to swap out the murder weapon]."

    39.    On February 14, 2018, between approximately 7:51 p.m. and at approximately 8:38 p.m., BROWN (while in Minnesota), using BROWN Phone 1, exchanged a series of text messages with Individual C, a relative of BROWN who lives in Minnesota. During this conversation, BROWN and Individual C negotiated the exchange of the suspected murder weapon for another firearm. Specifically:

      a.    Individual C stated, "9 8 shots with a beam [9mm pistol with 8 bullet capacity and a laser sight]." At the same time, Individual C also sent the following of a photograph of a Taurus, Model PT 709, 9 mm pistol:



b. BROWN, responded, "Yeah. I want it." Moments later, BROWN stated, "This the one I'm finna give you," and sent the following photograph of a Smith and Wesson pistol, which agents believe MURPHY used to murder Holmes, Jr. and Taylor, BROWN:



40. Three days later, on February 17, 2018, law enforcement officers in Wisconsin arrested Individual D in Milwaukee. At the time of his arrest, Individual D, a resident of Minnesota, possessed a Smith and Wesson, Model SD9VE, 9 mm pistol, bearing serial number FXT8477. Based on ballistic testing, law enforcement officers confirmed that the Smith and Wesson firearm that Individual D possessed on February 17, 2018 was the same firearm used to murder Holmes, Jr. and Taylor on January 31, 2018.

41. Based on training, experience, and knowledge of the investigation, other law enforcement officers and I believe that BROWN traded the weapon that MURPHY used to murder Holmes, Jr. and Taylor—namely, a Smith and Wesson, Model SD9VE, 9 mm pistol, bearing serial number FXT8477—to Individual C in

exchange for another gun—namely, a Taurus, Model PT 709, 9 mm pistol—and Individual C in turn gave or sold the murder weapon to Individual D, who was arrested with the murder weapon in Wisconsin on February 17, 2018.

## II.    CONCLUSION

42.    Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, from in or about December 2017 to in or about February 2018, DESHAWN MORGAN, DARIUS MURPHY, and DEMOND BROWN conspired with each other to use, and cause another to use, an interstate facility, that is, a cellular telephone, with intent that a murder be committed, that is, the murder of Holmes, Jr. and Taylor, as consideration for a promise and agreement to pay something of pecuniary value, that is, United States currency, in violation of Title 18 United States Code, Section 1958.

FURTHER AFFIANT SAYETH NOT.

PAUL R. DAOU
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SUBSCRIBED AND SWORN to before me on August 9, 2019.

MARIA VALDEZ
United States Magistrate Judge